First up is 221279, Carleton & Harris Chiropractic, Inc. v. PDR Network, LLC. Mr. Harrah, whenever you're ready. Yes, Your Honor. Thank you. And may it please the Court. Glenn Harrah for Carleton & Harris Chiropractic, Inc. The district court erred in dismissing this case on the basis that a fax cannot be an advertisement, as that term is defined in the Telephone Consumer Protection Act. unless on its face, within the four corners of the document itself, the fax, quote, offers something for sale, close quote, to the recipient. That's in A45 of the appendix. Do you agree that there needs to be a commercial nexus, at least, for the advertisement? No, Your Honor. Our primary argument is that this fax is an advertisement. And what case law do you have that supports your position that a commercial nexus isn't required? Because I haven't seen any. Well, it depends on commercial nexus. If you mean a pretext to future advertising applying the 2006 FCC rule, then there are cases, plenty of them, applying that rule, or at least adopting its reasoning, and getting the plaintiff passed a motion to dismiss. If we give deference to the rule? It didn't defer to it. It agreed with it. The Second Circuit said, we agree. That's beyond deference. Right. And at the pleading stage, you can't require a plaintiff. It's a catch-22, Your Honor. The plaintiff in Beringer couldn't know what happened at the free seminar that was advertised, but it was plausible at the pleading stage that this for-profit pharmaceutical company advertised its drugs at the seminar. The same thing is true here. I can't know what is in the 2014 e-book. I've never seen it. The district court's never seen it. This court's never seen it. And I'd suggest there's a reason why they don't want us to see it. But I can't allege what's in that book, because I just don't know. And I'm in the same position that the plaintiff in Positions Hellsource v. Beringer was in. Now, like the — I'm sorry. Can I just — but your — and your position is that's not a commercial nexus. Well, I think that is a commercial nexus. And why are you arguing that you don't need a commercial nexus? Because my primary argument is that — Right, and I'm saying how come? Like, I understand why that was your primary argument, whatever it was, many moons ago when we first heard this case. Many faxes ago. Right, because at that point, right, you hadn't amended your complaint to allege a commercial nexus. Now you've alleged a commercial nexus, so I guess I'm just — I'm having trouble understanding why your primary argument is that you don't need a commercial nexus. Because the plain language of the statute says an advertisement advertises the quality of property. Why did you amend your complaint? Well, because it's a belt and suspenders argument. We wanted to — if a pretext is necessary, we wanted the facts in the complaint to show that there's a pretext. We also had more information at that point. PDR Network submitted the only thing that we could call a factual record in this case, which is a one-page description of its services, of what it does. And it makes clear that PDR Network sells health care products and services to health care providers like my clients. Even if they're not explicitly doing so in this fax, they have things that they can sell. So they're unlike, for example, the defendant in Sandusky v. Medco, the six-server, where the defendant was a pharmacy benefits manager and it couldn't sell anything to the plaintiff if it wanted to. It didn't have anything for sale. Here, PDR Network sells interactive drug information services, digital communication services, behavior-based prescription management programs, all kinds of things to health care providers. Think about the fact that on the fax itself, the only place where health care products and services are mentioned is in the opt-out at the very bottom. Right, it tells you, you are going to continue receiving faxes about health care products and services from PDR unless you opt out. It's what the FCC calls a negative option, where the sender presumes your consent unless you tell them otherwise. The fact that it's in fine print at the bottom of the page I think is legally irrelevant, as the Seventh Circuit held in Holtzman v. Terza. Judge Easterbrook there said, what part of any do you have trouble understanding? Any material advertising. The fact that 80% of the fax in that case was informational and only 20% was advertising was irrelevant in that decision. Counsel, can I ask you about that? Because this is the basis for like your pretext argument, right? Pretext to a sale. But I thought, I mean, the pretext language is somewhat confusing to me. But if we're talking about like a prelude to a sale or something, I thought those were cases where the idea was that the free thing being offered, like a seminar or a catalog or something, would then be sort of leveraged. Once you take the free thing, they'll leverage that to make a sale. Like you give me a free e-reader and then the next thing you know, you're sending me advertisements for e-books. But here this is like the opposite. This is saying take it or don't take it. Forget the volume. One way or another, we're coming back to you unless you opt out. So this case seems really different to me because the product that's being described isn't going to be used in any way, leveraged in any way to make a later sale. I just don't understand how like just saying in a fax, if you don't opt out, we're going to sell you stuff. I guess I'm just not understanding how that fits into that line of cases. Well, first of all, we don't know what happens, what PDR does when somebody accepts a copy. I understand, but this is a different allegation, I thought. But PDR does have things to sell to the plaintiff. So I'm just saying that's different than the cases where summary judgment was granted in Medco. At least they got some discovery into what the defendant did. We've had no discovery whatsoever. So if you're relying on it just for the fact that PDR sells stuff, that's one thing. And they're telling you you're going to get future advertisements. Whether or not you take the volume. Correct. Unless you opt out. But let's say you do accept the free 2014 e-book. We don't know what follow-up happens after that. We don't know what's in the 2014 e-book. I think it's reasonable to presume, although I can't allege it, that PDR advertises those health care messaging services, interactive drug information services in the 2014 PDR e-book. And the district court found all of this way too attenuated. So what is your response to that? It's a pretty radical holding, Your Honor, that the fax itself within its four corners has to try to sell you something in order to be an advertisement. That doesn't sound radical to me, but carry on. Well, the statute doesn't say that. The statute says an unsolicited advertisement is any material advertising the commercial availability or quality of any property, goods, or services. It doesn't say anything about attempting to sell. It doesn't say anything about it having to be the sender's property, goods, or services that are being sold to the recipient. It's a very broad definition. And all the authorities PDR is relying on, and the district court, place these artificial additional words into the statute that aren't there, like commercial quality, for example. The district court wants to read it as commercial availability or commercial quality of any property, goods, and services. I've argued below, and I argued in my brief here, that that's redundant. Commercial quality is the quality of being commercially available. It means the same thing as commercial availability, and PDR network really hasn't meaningfully told us what the difference is there or why we have to stick that extra commercial word into the statute. It doesn't belong. Can I ask a follow-up about the scope of the pretext theory that you're espousing? So I think you're suggesting that pretext at least reaches the ability of PDR to later leverage the fax to sell other products that you don't know what they are, because they aren't in the book. I thought I recall, and this case has been around for a while, so maybe I'm just in my worst nightmares remembering something that's incorrect. But I thought I recall an argument that the pretext reaches as far as perhaps a kickback from the drug manufacturers who advertise the products in the book. Do I have that right? That's right. We expressly allege in the complaint, in the amended complaint, that PDR is compensated by the pharmaceutical companies based on how many copies of the 2014 e-book they distribute. So PDR network stands to profit. Their profit turns on how many, that's the language you use. And how does that fit within what the district court found to be the unambiguous text of the act? It provides the commercial nexus, because PDR, we allege, is being compensated based on whether it can persuade people to accept this 2014 e-book or not. Now, I want to note, PDR network will probably argue that we failed to make that argument in our brief, but that's not true at pages 20 through 21. We argued, of our opening brief, we argued that because the fax relates to PDR network's for-profit business, if this court adopts the Second Circuit's rationale in Behringer, the fax would be presumed to at least plausibly be an advertisement at the pleading stage. And we say that's consistent with this court's ruling in the first appeal, that it is, quote, certainly plausible that the amount of money PDR receives turns on how many copies of the physician's desk reference it distributes. So we did make that argument. We've made it all along. And I don't know that it's really disputed, but, I mean, PDR admits that they are compensated by the pharmaceutical companies whose drugs are listed in the physician's desk reference. I think that's undisputed. I don't know if they've admitted that they get paid more each, you know, based on how many copies of the thing. Did you make that argument in the district court? Yes. And what did the, for the rest of my recollection, how did the district court, if at all, address that? It held that that's too hypothetical because it's not in the fax itself. It has to be an offer to sell something to the recipient in the fax itself. It's a very strict interpretation that the district court gave it. Most courts at least allow for a pretext theory of liability in theory, right? The district court in this case wouldn't do that. It has to be in the four corners of the fax. Notably, PDR Network doesn't defend that rationale in this court. PDR Network says at page 26 of its brief, to be an unsolicited advertisement, the fax itself must make a sale or be so integrally part of an attempted sale as to render the fax effectively a pretext to a solicitation. So PDR Network, you know, concedes that you can at least in theory have a pretext theory of liability for a TCPA junk fax violation. The district court opinion in this case disagrees with that. It contradicts that. Can I ask you sort of on a different area of your argument where you argue about the 2006 rule, right? Your first argument, even though you've alleged a commercial nexus is you don't need one under the 2006 rule. Do you read that rule, which, you know, we have construed as this kind of per se prophylactic rule, do you read that rule or the commission as saying that the statute doesn't require a commercial purpose or nexus? Or is the commission saying that the statute does and because it will so often be present in cases where people are offering free goods or services, will prophylactically assume it's present in all of those cases? You know, we're just kind of weighing the ease of enforcement and clarity, those benefits, against the fact that it might actually be somewhat overbroad. I think it's the second one, Your Honor. Okay. I do, too. But then let me ask you this. If it's the second one and we're under Skidmore, I'm not sure how deference works because all we're trying, we're not under Chevron anymore. We're just trying to construe the statute. And the commission, as I think we agree, like wasn't exactly construing the statute. It was sort of saying something different, that even if the statute requires a commercial nexus, just we're not going to make people prove it up in every case because we know it's going to be there in 99.9% of the cases. Do you see what I'm saying? I'm just having trouble with your Skidmore deference argument. I think the commission was construing the statute, and the part of it that it focused on, I think the key to it is what it focused on was the quality of property goods or services. These things are presumed to advertise the quality of property goods or services, even though they don't advertise the commercial availability of property goods or services. They advertise the quality. But your first answer to me was, but the commission understands they don't always. They just almost all the time do. They almost all the time will have a commercial nexus if they are promoting the quality of a good or service. But they won't always have the commercial nexus. But they don't always. I agree. And the commission recognized that in the presidential who's who decision that PDR Network relies on. It recognized in footnote 20, I believe, that more broadly the 2006 order says, faxes offering free goods or services are advertisements under the CCPA. But it didn't have to apply that broad rule in the presidential who's who because there was a record. They can show that it was a pretext, that there was follow-up after somebody said, sure, I'll be in the presidential who's who. Then they started getting other solicitations for things that did have a cost, that weren't free. So I would like to say you only get to, I just want to be clear, you get to the pretext argument only if you find the statute ambiguous. And our first argument is that the statute is clear that faxes that advertise the quality of property, goods or services are advertisements. And there's really no need to get any further than that. And the alternative, of course, is if you disagree with our reading of the statute, you disagree with our reading of the FCC rule and whether it's entitled to skid more deference, we would ask that the court follow the only other circuit court of appeals on this issue, the Second Circuit in Beringer, and hold that at the pleading stage, there's a presumption in place that the defendant can rebut after there's been discovery into the circumstances of the sending of the fax and what happened at the free seminar in that case, what's contained in the free publication in this case. Thank you. Thank you. Thank you, Mr. Harrah. All right. We'll hear from PDR Network. Are you ready, sir? Yes. May it please the court. My name is Kwaku Okoa. I represent the PDR entities. And I'd like to start where Mr. Harrah left off with the text of the statute. Now that we understand that the FCC didn't promulgate a rule, didn't create a separate legal requirement in the 2006 order, we really are talking here about what scope of liability is created directly by the statute. And I think the core of that statutory requirement, the core of that scope of liability is the word commercial. We know that from the text and also how the Supreme Court has construed a different definition in the same statute. We know it from the congressional findings that underpin the TCPA. And we know it from the underlying constitutional framework that Congress is pointing to. So to start with a text, the phrase commercial availability or quality, every court that has construed that language has understood it in the way that Mr. Harrah objects to, is saying that commercial modifies both availability and quality. And the Supreme Court in the Facebook versus Duguid case just two years ago, construing a different definition in the TCPA, 227A1 versus 227A5, said when you have a concise, coherent phrase like that, so there the phrase was store or produce, here availability or quality, a modifier runs through both halves of that. And that's a natural understanding of the phrase. So I think that Mr. Harrah's first textual argument really runs up against the plain language of the statute. So counsel, assume at least hypothetically that I think, yeah, there's some commercial, what we're talking about has to be commercial for it to come within the statute. So I think you say this in your brief, commercial means relating to or involving the buying and selling of goods. So I don't understand then why this wouldn't be covered. This is a fact that promotes a reference volume that is allegedly at least funded in part by drug companies and that lists products that drug companies sell. It seems like that would be related to the buying and selling of the funding drug companies' products. Well, so funding drug companies' products, they're not funding the drug companies. The drug companies that allegedly pay extra for every volume that is sold or every volume that is placed. Sure. So I think the particular understanding of commercial that the court should have, and again, I think this is the understanding that's been applied as a matter of consensus, is derived first from Congress's findings in the TCPA and then the underlying constitutional framework, as I said. So in Section 2 of the Public Law 102-243, you have a set of express findings which are codified as a note to Section 227. And what Congress is pointing to is our reasons for adopting the TCPA are that Americans are getting buried in solicitation calls. Those are revenue-raising calls, more than $435 billion. So they're worried about that. But this is a revenue-raising call, or facts, as alleged for every volume they place, they make more money. It's PDR's business model. So Congress went on. And what they said is we have an understanding of where the First Amendment framework comes into play. So this is in Section 2, sub 13. We have to distinguish between commercial calls and non-commercial calls, consistent with the free speech protections embedded in the First Amendment of the Constitution. And then in sub 8, they said the Constitution does not prohibit restrictions on commercial telemarketing solicitations. So what understanding of commercial is Congress bringing to the table here? It's the one underscored just two years before that, and many times since by the Supreme Court, in Board of Trustees versus Fox. The heart of commercial speech is the offer to engage in a commercial transaction to buy and sell. And then the Court goes on to say, because there it was talking about a policy that extended beyond. So there were some buy-sell transaction offers that were in play, but also others that were motivated by profit. And what the Supreme Court said, I think... I mean, Judge Harris' example is exactly that, isn't it? This fact is motivated ultimately by some profit down the road. And that's just where I'm coming to. Here's what the Supreme Court said. While these examples consist of speech for a profit, they do not consist of speech that proposes a commercial transaction. I understand that, and that is why, even in the 2006 regulation, I think they do bracket out. They say, look, it can't be anything that you send with a profit motive. If you're sending an industry newsletter to generate goodwill that you will later use to make a sale, that's not covered. But this has to be describing the quality, promoting the quality of a product. You have to be saying, this is a great product, and you have to be saying that with a profit motive. So that's different from anything with a profit motive. This is a pitch. Take my product. My product is great, and I am making that pitch because I will make money if you take my product. Why would it care? What in the word commercial tells me that it matters whether I will make money from you, the recipient of the product, or from some third party who will give me the money if you accept my sales pitch? So my next answer is that that's exactly how the FCC has construed exactly this statutory phrase, unsolicited advertisement, for purposes of the robocall provisions of the statute. I should defer to that one. The commission, looking at what Congress has been focused on, has consistently, I think this is the difference, across time, said that if the communication is about an over-the-air, free program, it's not an advertisement. If the communication is about over a cable, pay-for-service communication or program,  and they've been very clear, because I think the commission is looking at this line that the Supreme Court has drawn in the commercial speech area, where they said many of our most important and high-valued items of speech are motivated, in a sense, by profit. But what about the Second Circuit case that appears to go against your position? So I think Beringer is really distinguishable. Beringer is a case where you have a company that has its own products, and then invites people to a seminar. And they said, okay, this is a seminar possibly, at least about a condition, and possibly about the particular drug they sell. So I think to come to the pretext point, Judge Harris, I think you're exactly right. The notion of pretext, the word itself, pretext, tells us it's about disguise. So we have a two-step program in which the first step... So in the Second Circuit, it was less attenuated than, the connection was less attenuated than it is here, which is what the district court apparently found. Yeah, I think that's right. But the two-step was quite clear, or at least was inferrable from the allegations. The two-step was step one, we invite you to what appears to be a free seminar. But step two, you walk into the seminar and it's a sales pitch. That's the pretext two-step, I think, because the Second Circuit understood it. Counsel, when you were describing Behringer, is it important, and it seemed like it was important in your brief, that it has to be the sender of the faxes' own products that are going to be sold at the end of the day? Is that the limit you want us to adopt? I think it makes it clear in those circumstances why the Second Circuit saw it as a two-step. They said, you know, it's your seminar and it's your stuff. But I think the more important point here is the question that, the callicle you engaged in with Mr. Hara about, so wait, what is it that the opt-out is supposed to do? What is it the allegation that in the back there's some exchange of funds? I'd like to come later to why I don't think that's very plausible. But none of that has to do with a two-step. None of it has to do with you ostensibly get... I mean, the statute doesn't say it's only commercial advertisement and covered by the act if it's a two-step, right? I mean, commercial enterprises are fairly ingenious and think of all kinds of different models by which to promote their products. But, I mean, why would the statute be that limited? Well, so pretext is already, I think, way out on the edge of the statute. And that's why the Third Circuit has suggested that pretext is not a valid theory. There's a case before the Seventh Circuit right now, a case called Tallman. Seventh Circuit is considering, their decision hasn't come down yet, whether pretext is a valid theory at all. And most of the cases that have accepted it have accepted it out of the context that we were in previously where what everyone thought was that the FCC promulgated regulation. So that when you look to the regulation, you can look to the text of it and it says pretext and you can go from there. So now we're back to the statute. The statute, I agree, doesn't say anything at all about pretext. I think to try and fit pretext within what we do have in the statute, which is a requirement of commercial transaction in the constitutional sense, you do have to be pretty tight. Otherwise, you just have what the Third Circuit described in Mouthy versus National Imaging Associates. You say, well, just kind of everything becomes pretext because in your mind you can sort of say, you know, the hip bone is connected to the thigh bone, and that's clearly not what Congress was going for when it said we want to combat, you know, this abuse of advertising, but we also understand that we are constrained by the Constitution. We don't want to cross those lines. So where do we want to go? We want to focus on commercial transactions. And we know what the heart of that is. The Supreme Court has told us commercial means proposing a commercial transaction, buying or selling. So I think that's how we get there. So what First Amendment speech principle is being vindicated by the facts in this instance? So it doesn't, the question isn't whether there's political speech. It's just that the Supreme Court has distinguished between commercial speech, speech for transactions, easier, more scope for the legislature for Congress to regulate, and noncommercial speech. But you seem to have in mind something. So you think what Congress thought was under the First Amendment, all we can regulate is a direct offer of a product for sale. There has to be a direct offer. Because I don't even know what case that was that Congress was thinking of. I know the cases you mean about, oh, it's the heartland, blah, blah, blah. But I'm not, is there a case that says if it's not a direct offer of a product for sale under the First Amendment, you can't touch it? No, no, I don't think Congress was saying we can't touch it. Because they can't, there's heightened scrutiny, and sometimes statutes can survive heightened scrutiny. But I think what Congress was saying was we know that we have more scope when we're regulating commercial speech. And if we get outside of that frame, we know that there are lines we can't cross. And the ordinary constitutional avoidance framework tells us, the courts infer that Congress doesn't want to go near the lines. And here you have Congress saying it quite directly. Because, again, otherwise, you just have, I think, a kind of unconstrained, well, basically the per se rule that Mr. Harris has been arguing for. Let me just ask this. So let's say we were to disagree with the district court and decide that, you know, the statute says what it says, but the plaintiff should be allowed some discovery to figure out exactly what the motivations are regarding this fax. And let's say it turns out that your colleague on the other side is correct on both points. That is, that the fax, that the PDR, in fact, has products that it wishes to sell, which are identified in the book itself. And that the PDR also gets money, whether you call it a commission, a kickback, whatever, from the plaintiff. And the PDR gets money from the drug manufacturers for placing their products in the book. Would that be covered by the TCPA, if that turned out to be the case? Well, so first, I think it's important to talk about what's been alleged and what hasn't been alleged. There is no allegation that there's anything other than the FDA approved full prescribing information in the e-book. In fact, that's what is affirmatively alleged. You know, the copy of the fax itself, that what is contained, this is their pleading, same trusted FDA approved full prescribing information. There's not one word in the complaint that suggests there's something else in there. Okay, so what if they had pled that, I know that you're saying that's not this case, but if they had pled that and discovery turned out to support that theory, is that a violation of the TCPA? I think it would depend on what. But I think I can imagine a circumstance where you'd say that the complaint says, on its face it says all we're sending you is the FDA approved full prescribing information. And by the way, I think it's important to understand that the FDA doesn't just approve the prescribing information in a vacuum. It does it as part of the new drug approval process. So the drug can't be entered into interstate commerce until FDA has reviewed and approved the prescribing information. Also that the format content of the prescribing information is closely regulated by. I'm not sure you're answering my question. I apologize, a little bit of a detour. If it said, if the fax was like this, it said what you're getting is the full prescribing information, and then the allegation were, it turns out if you get the e-book, it's full of glossy ads. I can see that, I think that's the two-step. That then is, it looked like it was not an advertisement, but it turned out that it was, and in fact it was promoting sale. So I can see something like that, but that's not alleged anywhere here. Can I ask you, would it matter in that case if the ads were for PDR products or for drug company products? I think if the ads were for PDR products, then you'd really be close to the second circuit. What if it were for drug company products? For drug companies, I think maybe that's a step harder, but I can imagine, and it would depend on the exact nature of the pleading, but certainly sometimes there are middle men who stand in and they all talk for somebody else. There's the sender's own products, so it doesn't really matter. I think it would be clearer, but it sort of depends on the allegations, and again, you don't have that. So I just want to take you back to your detour. When you say that the complaint only alleges that it gives you the FBI, different case, the FDA. The FDA prescribing information for drugs. I mean, it does list the drug, right? It says here's a drug and here's how you prescribe it, right? And that's the allegation, I'm sorry. You could understand it as sort of calling to physicians' attention. Here's a drug, like it's a Merck X, and here's how you prescribe it. So one thing that I think is really important to understand is that in the process of approving this full prescribing information, FDA makes the determination that it is, quote, not promotional in tone. So that's 21 CFR 201.56A2. So it's not promotional, it's pre-approved. I understand that the prescribing information is not promotional, but it is a book. I thought what was alleged is that it is a book that lists out a bunch of drug company products and tells physicians how to prescribe them. Yeah, so here's what FDA says about what the full prescribing information is, and I think that's what's fairly alleged is that's what's in the e-book. It is written for, so it reflects FDA's findings regarding the safety and effectiveness of the human prescription drug under the labeled conditions of use. The PI, the prescribing information is written for the healthcare professional and must, one, contain a summary of the essential scientific information needed for the safe and effective use of the human prescription drug, be informative and accurate and neither promotional in tone nor false or misleading, and be updated when new information becomes available that causes labeling to become inaccurate, false or misleading. So it is the scientific backdrop. It sounds very dry, it is not a glossy advertisement. Yes, and we provided a couple of links as examples in our brief. If you go to that, I think you'll say this is nothing like people skipping through the meadows when I see a drug ad on TV. But nevertheless, if I'm a doctor, as I understand it, the way I would use this volume, the way it has been alleged I would use this volume is, I mean, I actually don't know how doctors work, but so I have a patient, this patient has a condition, I open it up and see what can I prescribe and how. And I will find in there a list of drug company products and how, in very, very dry terms, how they may be prescribed. I'm a doctor's son, so if I can say that with some pride. My father used to have the physician's desk reference on his desk every single year it would come. It's a giant encyclopedia. And so what else is basically alphabetical, you find the drug and it will tell you dosing information of someone's 17, of someone's 55. If someone's taking it, it's contraindicated. So under no circumstances take it if you have condition A in addition to condition B. If you drink, have more than three alcoholic drinks a day, never take this because of the or. Only take it if you're following blood work or the like. It's that kind of dry technical detail from the manufacturers to the physicians through the FDA's approval process. I see my time is almost up. I want to come back to what the district court said and I think didn't say. So I don't think the district court said you can never look outside the four corners. I don't read the opinion that way. I think what he's saying is I've looked at this other information that's been provided and it doesn't provide the kind of commercial nexus that would give rise to any kind of valid theory. I think the district court acknowledges a pretext theory. I don't think he comes down strongly one way or the other. But says I'm looking at this information, it's very attenuated, there's an opt out provision, there's some contact information. There's an allegation that there's an exchange that would have nothing to do with the recipient. I think this is the key point about the allegation that the drug companies pony up four cents each time a PDR goes out into the world, which I find hard to imagine. But none of that has anything to do with the recipient. None of that makes it commercial in the sense of promoting a sale. And I think that's exactly the right way to understand this fax. The reason he's standing here is saying I want a broad rule. He needs a broad rule because if we're asking whether this fax sells something to the recipient of the fax, the answer is no. And Judge Chambers got there, he's gotten there twice, and I think that's the right answer. If there are no further questions. Thank you, counsel. Mr. Harry, you've got some rebuttal time. Go ahead. Yes, thank you. There was discussion about the Barringer case, obviously, in the Second Circuit. If you read that opinion, the reason the Second Circuit held that there was a presumption at the pleading stage that got the plaintiff passed a motion to dismiss on a free seminar fax was not because the plaintiff alleged in the complaint that the defendant advertised its products at the free seminar. My law firm was counsel for the plaintiff in the physician's health source case. I don't have that complaint in front of me, and I can check, but I can at least say that's not what the Second Circuit relied on. What the Second Circuit relied on was the arguments of the parties and its common sense, right, and the reasoning of the 2006 order, which the court agreed with, where it held, you know, this is a for-profit corporation. They don't do things for no business purpose. It's unfair to the plaintiff because the TCPA is a remedial statute that we're supposed to interpret in favor of the consumer and not in favor of the fax advertiser. So since there's an ambiguity in the statute about whether free goods or services, faxes or advertisements, we're going to resolve that, at least at the pleading stage, in the plaintiff's favor. And we're going to give the plaintiff some discovery into the underlying circumstances of the case. Just like what happened in the BPP case that the PDR Network submitted as supplemental authority a couple of weeks ago. That was decided on summary judgment. The plaintiff got discovery into what happened in the case. Otherwise, it's a catch-22. I would be required to plead what's in a publication that I don't have access to. Only the defendant has access to it. Just like the plaintiff and physicians in Beringer didn't have access to the slides that were shown at the free seminar, for example. There's no way the plaintiff could have known that. We don't know the contents of the 2014 e-book. So I don't allege anything about this. No, but I think as in Beringer, that's a reasonable inference. That PDR Network would not turn down that opportunity to advertise these other products and services that it sells to health care providers like my client. You allege that PDR benefits or profits from the sale of the health care products and services referred to in the fax. But the only place health care products are referred to in the fax is the opt-out, which tells you how not to get this book. So I don't see how that allegation gets you there since you can't benefit or profit from something you're opting out of. Well, it's telling you we're going to send you advertisements or information about health care products and services. It's telling you we're not. The only place it talks about health care products and services is in the opt-out. Yes. And it says unless you opt out, we are going to send you more stuff, right? And we know from... That's putting the burden on the consumer. It's a negative option. You're saying it's okay to deluge the consumer with junk faxes unless they opt out. It's the burdens on them. I still am struggling with what your claim is about the opt-out language. So is it your position, I guess it is, that if you get a fax that just says, you know, tomorrow I'm going to send you an advertisement, the first fax was also an advertisement? I think if it says unless you tell me not to, I'm going to send you an advertisement. How could that make it worse? Yeah, it's a pretext. So the first, it's just like, just get a fax tomorrow and it says, on March 20th, I'm sending you an advertisement. That first fax is also an advertisement. Because it's a pretext, it's not very pretextual, it just says on the 20th you're getting an ad. It's very upfront. I think under the FCC ruling, that's a pretext, yes. A pretext for what? For advertising, for future advertising, or part of an overall marketing campaign. You're testing the waters first to see if maybe you can get some interest there. A lot of times, robo-callers, they'll text you or call you, and when you opt out, they say, hey, we've got a live one here. That means there's somebody listening on the other end of this line, so it's a good number. The FCC has encountered that. So you're saying maybe if it just says you're getting an advertisement tomorrow, it's not an advertisement, but if it says unless you opt out, you'll get an advertisement, then that might be part of a marketing campaign, because they're very interested in whether I will bother to opt out? I think that's reasonable, yeah. My time has expired. If there's no further questions, thank you. All right, thank you both for your arguments this morning.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris